**UNITED STATES of America**

v.

**Mustafa MAISONNEUVE.**

No. 2:96–cr–17–02.

United States District Court,
D. Vermont.

Nov. 13, 1996.

Thomas J. Sherrer, Eastman, Sherrer & Broadfoot, Burlington, VT, for Mustafa Maisonneuve.

John M. Conroy, Asst. U.S. Atty., Burlington, VT, for U.S.

## OPINION AND ORDER

SESSIONS, District Judge.

On April 11, 1996, the Grand Jury returned a one-count indictment charging Mustafa Maisonneuve with conspiracy to distribute cocaine base in violation of 21 U.S.C. § 846, and § 841(a)(1). A superseding indictment was returned on May 23, 1996, adding several substantive counts. Maisonneuve filed a motion to suppress statements made to Detective John C. Lewis of the Burlington Police Department on the date of his arrest. A hearing was held on September 9 and October 15, 1996. Based upon the evidence elicited at that hearing and memoranda submitted by the parties, the Court hereby DENIES Maisonneuve's Motion to Suppress (Papers 20, 36).

### I. *Findings of Fact*

In January 1996, law enforcement officers were investigating individuals allegedly engaged in distributing crack cocaine from an apartment house at 259 North Winooski Avenue in Burlington, Vermont. On January 12, 1996, Burlington police officers obtained a state-issued warrant to search the residence of Tamiko Johnson and Lenice Fullwood at that address. During execution of the warrant on that date, police recovered U.S. currency from earlier controlled purchases of cocaine base from both of these individuals. In post-search interviews, Johnson admitted to distributing crack cocaine over a number of weeks and to flushing a quantity of crack cocaine down the toilet as police entered the apartment. She identified her source of supply as located in Springfield, Massachusetts. Fullwood also admitted her involvement in distributing drugs, and identified a Haitian named "Mustafa," later identified as Maisonneuve, as her source of supply. She said that he was planning a trip to Vermont to

collect payments for previous drug deals. Fullwood agreed to make monitored telephone calls to Maisonneuve. During those telephone calls, Maisonneuve said that he was travelling to Burlington, Vermont that evening.

Burlington officers were conducting surveillance of· 259 North Winooski Avenue when Maisonneuve was expected to arrive. Officers saw Maisonneuve and another man in a car with Massachusetts registration plates that pulled into a rear parking lot next to the apartment house. The car's occupants entered the common hallway in the building. Police followed with guns drawn, ordering and them to the floor. Maisonneuve told the police that they had the wrong person. Both individuals were placed under arrest. At the time of his arrest, Maisonneuve identified himself as Gregory Baptiste.

Lewis escorted Maisonneuve to an unmarked vehicle. Detective Walter Decker was in the vehicle's driver's seat. Lewis was in the back seat with Maisonneuve. Lewis identified himself and explained that Maisonneuve was suspected of violating state and federal narcotics laws. Lewis advised Maisonneuve of his Miranda rights. Maisonneuve was attentive and appeared to have no difficulty understanding those rights. When Lewis asked Maisonneuve whether he understood those rights, Maisonneuve stated "yes". He then. told Lewis that he was not involved in drugs, and that he was in Vermont only to pick up Johnson and Fullwood whom he described as friends. At no time during this or subsequent interviews did Maisonneuve request counsel or assert his right to remain silent.

The conversation turned to cooperation. Lewis attempted to obtain Maisonneuve's cooperation by advising him of the weight of the government's proof and the significant federal penalties for distribution of cocaine base. Lewis also explained what the cooperation involved, including identification of sources of supply, efforts at setting up controlled purchases of illegal drugs from those sources, and assistance in locating drugs that were brought to the state. If Maisonneuve cooperated in the pending investigation, Lewis promised to advise prosecutors of Mai-

sonneuve's level of cooperation. Decker also asked whether Maisonneuve had children, although it is unclear whether such questioning was coercive. Maisonneuve agreed to cooperate, but continued to deny any role in distributing drugs. He also denied having been arrested in the past. The discussion ended, and Decker transported Maisonneuve to the Burlington Police Headquarters.

Lewis interviewed Maisonneuve briefly at headquarters. Lewis again explained the benefits of cooperation and the significant penalties for distribution of crack cocaine. Maisonneuve continued to say that he had not been involved in distributing drugs, that Fullwood and Johnson were friends and that he had come to Vermont merely to pick them up and to return to Massachusetts. Lewis stopped the interview, informed Maisonneuve that he was being processed on state drug distribution charges and placed him in a holding cell until he could be transported to a state correctional facility.

A record check on the name Gregory Baptiste revealed a long list of drug and violent felony convictions. Lewis confronted Maisonneuve with a computer printout of his criminal record:

> I walked to the cell, opened it up. I stood in the cell. He was sitting on the bench there with his feet—his heels on the bench back against the wall, kind of hugging his feet. And I said, You told me that you were never arrested, and he said, No, that's right, I never was. I said, Well, explain to me—and I unfolded the paper, which was probably about five feet long at that point, and I asked him, Well, explain this. You have got a number of convictions for these different things. And he kind of just looked at me deadpan, just stared at me and then. looked down, and just kind of shook his head, and at that point I folded it back up and I locked the cell door and went back to complete my paperwork.

(Tr. at 20.)

Lewis requested that Officers Shannon Manor and Jeffrey Lawrence transport Maisonneuve to the Northwest Regional Correctional Facility. Manor and Lawrence took

custody of Maisonneuve in the sally port of headquarters. While in the sally port, Lewis again discussed cooperation with Maisonneuve. On a couple of occasions, Maisonneuve said he was willing to talk with Lewis. Lewis asked if he did wish to speak and Maisonneuve remained silent. Lewis then told Manor and Lawrence that Maisonneuve did not wish to talk any further and should be taken to the correctional facility.

Manor and Lawrence placed Maisonneuve in the back seat of their cruiser for transport. They did not ask questions nor engage in conversation with Maisonneuve. Maisonneuve was very quiet, with his head down and shoulders slumped. As the cruiser began moving, Maisonneuve said that he wanted to speak with Lewis. Lawrence stopped the cruiser. Lewis came over to the cruiser to ask Maisonneuve if he wished to speak. Maisonneuve answered in the affirmative and agreed to return to headquarters. During the subsequent interview, Maisonneuve made several incriminating statements, indicating that he travelled to Vermont on behalf of a "Heavy" Kelly to collect money due from deliveries of crack cocaine. Thereafter, Maisonneuve made a number of monitored telephone calls to Heavy and his girlfriend. Eventually, Maisonneuve was charged in state court and released after posting cash bail. He failed to appear for state proceedings. Subsequently, the federal indictment was filed.

Maisonneuve is a citizen of Haiti and a resident of Springfield, Massachusetts. He is a graduate of an American high school and attended the City College of New York for two years. He is fully conversant in the English language. He has three prior felony convictions, two of which were for drug related offenses. He testified that he was familiar with Miranda rights, having received them during past arrests.

Maisonneuve testified at the suppression hearing to facts which differed substantially from observations made by the officers. He stated that he had not been given Miranda rights until after the monitored telephone calls to Heavy were made, testimony refuted by both Decker and Lewis. He described both threats and promises by Lewis which were not corroborated by the officers. His narration of the sequence of events during the evening after his arrest also differed substantially from the officers' testimony. Maisonnueve stated that his statements concerning Heavy were made prior to being first placed in the cruiser for transport, and that once placed in the cruiser, he never returned to the station. That testimony is directly refuted by detectives Decker and Lewis, and also by Officers Lawrence and Manor.

After failing to appear on related state charges, Maisonneuve was arrested in Massachusetts. He identified himself to the arresting officer as Anthony Smith. At least one of his prior convictions were under a false name. At the time of his arrest for the instant offense, he used the name Gregory Baptiste and had a false driver's license under that name. He was deported from the United States in 1994.

## II. *Discussion*

Maisonneuve seeks to suppress incriminating statements made to Lewis concerning his drug activities and in monitored telephone conversations with Heavy and his girlfriend. He relies upon a number of grounds in asserting that those incriminating statements were obtained in violation of his Fifth Amendment rights: (1) Lewis did not advise him of his Miranda rights; (2) that if Miranda rights were explained to him, those rights were inadequate; (3) that he did not freely and voluntarily waive his Fifth Amendment rights; (4) that his assertions of his right to remain silent prior to making statements were ignored; and (5) that he did not voluntarily re-initiate discussions with Lewis once he had asserted his right to remain silent. Each of these issues will be addressed in turn.

### A. *Miranda Advice*

The United States Supreme Court mandated that an accused be advised of Fifth Amendment rights prior to being subjected to custodial interrogation in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The government bears the burden of proving in light of the totality of the circumstances that law enforcement officers

properly advised the accused of those rights and that he or she made a knowing and voluntary waiver. *Moran v. Burbine*, 475 U.S. 412, 420–21, 106 S.Ct. 1135, 1140–41, 89 L.Ed.2d 410 (1986); *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986).

▮ Lewis testified that he read Miranda rights to Maisonneuve in the unmarked cruiser prior to initiating interrogation. Decker confirmed that the rights were explained. Maisonneuve claims that the rights were not read, pointing to the absence of any written acknowledgment and waiver of rights. Although it is the better practice for law enforcement officers to obtain a signed acknowledgment and waiver of rights from suspects, such a written document is not essential under the Fifth Amendment.

In weighing the testimony of the various parties to the interview with Maisonneuve after his arrest, the Court finds the testimony of Lewis and Decker to be credible. Given the degree to which Maisonneuve's testimony conflicted with other witnesses that evening, Maisonneuve appears at best to be confused regarding the sequence of events. His testimony that he received rights prior to his being transported to jail, but only after interrogation had been completed is unreliable. The government has met its burden of proving that Miranda rights were explained to Maisonneuve prior to interrogation.

### B. *Adequacy of Miranda Rights*

▮ Maisonneuve claimed that the rights given by Lewis prior to interrogation were inadequate under *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). He failed to disclose how the rights were deficient. Lewis testified at the suppression hearing to the following:

I advised him that he had the right to remain silent.

I advised him that anything he said could be used against him in a court of law; that he could refuse to answer any questions asked of him at any time; that he had a right to an attorney, and to have an attorney present before he was questioned; and

that if he could not afford an attorney, one would be appointed to him by the court. (Tr. at 12)

The Court finds that the rights explained by Lewis complied with the Fifth Amendment and *Miranda v. Arizona.*

### C. *Voluntary Waiver*

Maisonneuve asserts that he was subjected to coercion and threats from law enforcement officers both in the cruiser and in the station and that his subsequent waiver was not freely and voluntarily obtained. Specifically, he argues that Lewis and Decker threatened that his case would be transferred to federal authorities, that he could face up to ten years in prison and that he would lose his children as a result. Conversely, if Maisonneuve cooperated, Lewis would speak with the appropriate prosecutor to obtain leniency. Maisonneuve alleges that he was led to believe that he would be released if he cooperated that evening.

▮ To prove a valid waiver, the government must prove from the totality of circumstances that (1) the relinquishment of the defendant's Miranda rights was voluntary, and (2) that the defendant had a full understanding of the right being waived and the consequences of waiving that right. *Moran v. Burbine*, 475 U.S. at 421, 106 S.Ct. at 1140–41. Such proof must be by a preponderance of evidence. *United States v. Ramirez*, 79 F.3d 298, 304 (2d Cir.) *cert. denied,* —— U.S. ——, 117 S.Ct. 140, 136 L.Ed.2d 87 (1996). Promises of leniency, without more, do not invalidate a Miranda waiver. *United States v. Guarno*, 819 F.2d 28, 31 (2d Cir.1987). In *United States v. Bye*, 919 F.2d 6, 9 (2d Cir.1990), the Second Circuit held that statements by law enforcement officers to defendants concerning the benefits of cooperation are merely one factor in the totality of circumstances that determine whether a confession is voluntary. *See also United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir.1995).

▮ In the instant case numerous factors indicate that Maisonneuve understood Miranda rights and waived them knowingly and voluntarily. Maisonneuve had been arrested

and convicted in the past of three felonies and was fully familiar with his Fifth Amendment rights. Although a citizen of Haiti, he had completed two years of college in the United States and was conversant with English. When asked by Lewis, he said he understood his rights, and he proceeded to offer exculpatory statements prior to interrogation. Furthermore, the statements of Lewis and Decker were not unduly coercive. There is no credible evidence that their remarks were any more threatening than to define possible ranges of sentences and benefits of cooperation. Nor is there sufficient evidence to find that Decker's statements regarding the children were threatening. And finally, in response to these allegedly coercive statements, Maisonneuve continued to deny any involvement in drug distribution. His incriminating statements occurred later in the evening, after he voluntarily re-initiated discussions with Lewis.

The Court finds that Maisonneuve acknowledged that he understood his Fifth Amendment rights and that he waived those rights freely, knowingly, and voluntarily prior to discussing his rule in the conspiracy.

### D. *Assertion of Right to Remain Silent*

Maisonneuve's next argument is that he asserted his right to remain silent when Lewis confronted him with a criminal record printout in the holding cell. His response to Lewis' request that he explain the criminal convictions listed under the name Gregory Baptiste was to look down and shake his head. Maisonneuve claims that shaking his head was an assertion of his right to remain silent and that further questioning without reinitiation by Maisonneuve violated his Fifth Amendment rights.

The Supreme Court in *Miranda v. Arizona*, 384 U.S. at 473–74, 86 S.Ct. at 1627–28, ruled that all questioning of a suspect must cease when that person "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent." However, when the indication is ambiguous, it does not necessarily follow that questioning must be terminated.

In *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the Supreme Court addressed equivocal assertions of Fifth Amendment rights during custodial interrogation. The defendant in that case, during questioning, made an equivocal reference to getting a lawyer, thereby raising the issue of whether he actually invoked his right to counsel. The Court was concerned with establishing a "bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information." 512 U.S. at 461, 114 S.Ct. at 2356. It required that a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* at 459, 114 S.Ct. at 2355. The Court went on to say: "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Id.* at 461–62, 114 S.Ct. at 2356. The *Davis* holding has been applied to cases involving assertions of the right to remain silent. *Coleman v. Singletary*, 30 F.3d 1420 (11th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1801, 131 L.Ed.2d 727 (1995); *United States v. Andrade*, 925 F.Supp. 71 (D.Mass.1996); *State of Vermont v. Bacon*, 163 Vt. 279, 658 A.2d 54, *cert. denied* —— U.S. ——, 116 S.Ct. 117, 133 L.Ed.2d 67 (1995). *See also Ramirez*, 79 F.3d at 305 (to the extent that Davis applies to the right to remain silent, Defendant's nonresponse did not constitute a clear request that questioning cease).

When Maisonneuve was confronted with a list of criminal convictions, his response was to shake his head. Although he had been advised of his right to remain silent, he did not verbally assert it. At most, shaking his head was an equivocal assertion of his right to remain silent. It was not an act of sufficient clarity that a reasonable police officer in the circumstances would understand it to be an assertion of his right to remain silent. As a result, Lewis was under no obligation to discontinue questioning.

### E. *Re-initiation of Questioning*

Even if the Court were to find that Maisonneuve asserted his right to remain silent,

his statements would still be admissible if he voluntarily re-initiated contact with police and waived his Fifth Amendment rights. In *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981), the Supreme Court held:

> [A]n accused, ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

The Court in *Edwards* established a two-pronged test to determine the admissibility of statements made after an accused has asserted Fifth Amendment privileges. First the government must establish that the accused reopened the discussions voluntarily. Second, based upon the totality of circumstances, the government must prove that the defendant knowingly and voluntarily waived his rights to counsel and/or to remain silent. 451 U.S. at 486, n. 9, 101 S.Ct. at 1885, n. 9; *Oregon v. Bradshaw,* 462 U.S. 1039, 1046, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983). In making that assessment, the Court must consider "the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *Id.* at 1046, 103 S.Ct. at 2835 (quoting *North Carolina v. Butler,* 441 U.S. 369, 374–75, 99 S.Ct. 1755, 1757–59, 60 L.Ed.2d 286 (1979)).

■ It is very clear that Maisonneuve knowingly and voluntarily re-initiated communications with Lewis. As Maisonneuve was being driven to the correctional facility, he voluntarily requested to speak with Lewis. His request was not in response to prompting by law enforcement officers. He was certainly aware of his right not to speak with Lewis. His unprompted statements both to the transporting officers and to Lewis that he wished to speak with Lewis clearly "evinced a willingness and a desire for a generalized discussion about the investigation." *Oregon v. Bradshaw,* 462 U.S. at 1045–46, 103 S.Ct. at 2835.

The next issue is whether Maisonneuve knowingly and voluntarily waived his right to remain silent. The government must prove by a preponderance of evidence that such a waiver "must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege." *Edwards v. Arizona,* 451 U.S. at 482, 101 S.Ct. at 1884. Such an assessment is based upon the all of the circumstances surrounding the case, including the "background, experience, and conduct of the accused." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). The fact that Miranda rights were not re-read to Maisonneuve is only one factor to be weighed in assessing whether such a waiver was knowingly made, especially when the accused had been read Miranda rights within a short time of reinitiating the interrogation. *See United States v. Velasquez,* 885 F.2d 1076, 1087 (3rd Cir.1989), *cert. denied* 494 U.S. 1017, 110 S.Ct. 1321, 108 L.Ed.2d 497 (1990).

■ Maisonneuve was fully cognizant of his Fifth Amendment rights, based upon his intelligence, educational background, and prior experience in the criminal justice system. At the time he requested to speak with Lewis, he was not being coerced or threatened in any way. Lewis did not apply overly coercive or deceptive techniques to encourage Maisonneuve to cooperate. Maisonneuve remained calm and coherent throughout the entire process, and expressed willingness to cooperate with the investigation. Based upon these factors, the Court finds that Maisonneuve knowingly and voluntarily waived his Fifth Amendment rights.

### III. *Taped Telephone Conversations*

■ Maisonneuve also raised a concern about the legality of recorded telephone conversations between Fullwood and Maisonneuve and between Maisonneuve and Kelly. The grounds for that concern were not specified. As a result, the Court denies any objections to the admissibility of the tape-recordings at this point. If specific grounds for the inadmissibility of the tape-recordings are brought to the Court's attention, this ruling will be reconsidered.

IV. *Order*

For the reasons stated above, the Court DENIES Defendant's Motion to Suppress Evidence (Papers 20, 36).