**UNITED STATES of America**

v.

**Lili CHIOCHVILI, Defendant.**

**No. 99–CR–34 (LEK).**

United States District Court,
N.D. New York.

Dec. 1, 1999.

Honorable Daniel French, United States Attorney, Albany NY, Carlos A. Moreno, Assistant U.S. Attorney, of counsel, for the United States of America.

Office of William P. Fanciullo, Albany NY, William P. Fanciullo, of counsel, for defendant.

### DECISION AND ORDER

KAHN, District Judge.

In this criminal action, Defendant is charged with transporting three aliens in the United States in knowing or reckless disregard of the fact that they were present in the United States illegally in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and with conspiring to do the same in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I). Presently pending is the one element of Defendant's omnibus motion that the Court's Decision and Order of 25 June 1999 (Doc. 37) and bench decision at the 30 July 1999 suppression hearing (Doc. 42) did not dispose of. This pending motion seeks suppression of statements purportedly made by the Defendant at the arrest scene as involuntary and as made in the absence of proper *Miranda* warnings.

### I. DISCUSSION

Pursuant to the Fifth Amendment

privilege against self-incrimination[1] it is well established and well known that a person taken into custody by law enforcement officials must be advised of her rights, including, among others, the right to remain silent. *Miranda v. Arizona,* 384 U.S. 436, 467–68, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (Warren, C.J.). A statement in response to officials' questions given by a defendant while in custody, before she has been advised of her *Miranda* rights, must be deemed involuntary, and inadmissible at trial. *Id.* at 468–69, 86 S.Ct. 1602. Defendant was *"Mirandized"* not at the arrest scene (as stipulated by the Government, Suppression Hr'g tr. at 63 lines 7–9 (Doc. 42, 4 Aug. 1999) (hereinafter "tr.")), but at the Border Patrol station to which she was subsequently taken (*id.* at 39 lines 12–20).

■ The Border Patrol Agent who made the stop, John Letourneau, testified that he had "probable cause" to believe that the people in the car had illegally entered the United States (Letourneau cross-examination, *id.* at 54 line 19 to 55 line 4), and he testified that, from the moment of the stop, Defendant was *not* free to leave the scene (*id.* at 55 line 8 to 56 line 1). The Court therefore finds that the Defendant was in custody from the time she was stopped at the arrest scene.

■ When the Government seeks to introduce a statement made by a suspect during a custodial interrogation, the Government bears the burden of establishing, by a preponderance of the evidence, that the suspect validly waived her *Miranda* rights and that the statement "was 'truly the product of free choice.'" *United States v. Ramirez,* 79 F.3d 298, 304 (2d Cir.1996). A statement is not voluntary if it is the product of "circumstances that overbear the defendant's will at the time it is given." *United States v. Anderson,* 929 F.2d 96, 99 (2d Cir.1991). To make this determina-

tion, a court must evaluate the totality of all the surrounding circumstances, including the mental state of the accused, the conditions of interrogation, and the conduct of law enforcement officials.

The Government's points—that the sovereign has the right of self-protection through control of its borders (untitled mem. at 3[2] (Doc. 44, 16 Aug. 1999) (hereinafter "mem.")), and that this right includes routine stops and searches without warrant of persons, effects and vehicles at or near international borders—are well taken. Nevertheless, the logical subtext of the Government's argument—that the stop, questioning and search of this Defendant and the car were the same as countless other such actions at United States border crossings, that day and every day— is not credible. When a Government Agent stops a carload of tourists at a popular border crossing, questions the occupants, and looks through their belongings, that is a *routine* border stop, inspired by none of the indicia of unlawful activity so clearly featured in the stop sub judice.

■ Here, Canadian authorities had alerted the Government Agents to suspicious activities (mem. at 1); the Agents observed individuals making a surreptitious crossing of the border, through the woods and under cover of night (*id.* at 2); and they observed suspicious actions by a car that picked up the individuals who had crossed the border on foot (*id.*). This was far from a routine stop of presumably legitimate border traffic, and the Government's equation of Agent Letourneau's questioning of Defendant with the perfunctory questioning of a driver at a heavily-trafficked crossing is wholly untenable. Border Agents clearly assume that most— indeed, almost all—of those they stop during routine border crossings will not be taken into custody, and obviously need not be read the *Miranda* rights. In contrast,

---

1. "No person ... shall be compelled in any criminal case to be a witness against himself...." U.S. Const. amend V.

2. The memorandum failed to include page numbers; citations are the Court's page count.

a reasonable person observing the events of the evening of 24 October 1998 would have presumed there was at least a very good chance that the car and its occupants were in, or would shortly be taken into, custody. Agent Letourneau by all appearances had probable cause to suspect illegal activity, and his stop of persons who had apparently *evaded* the routine stop at the port of entry was fully justified. By the same token, however, the Agent surely realized that an arrest was imminent, and indeed warranted by what he and other Agents had *already* observed.

For this reason, the Government's reliance on *Brignoni–Ponce* is inapt. In that decision, the Supreme Court stated that an officer who "reasonably suspects" that a vehicle is transporting undocumented aliens "may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause." *United States v. Brignoni–Ponce*, 422 U.S. 873, 881–82, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). The decision did not deal with the question of whether an officer must advise those whom he has stopped of their *Miranda* rights, and this Court need not now explore that issue. *Brignoni–Ponce* instead addressed only the matter of inquiries that an officer who has *a reasonable suspicion* of criminal activity might direct to persons who are *not* in custody. In the case sub judice the Agent had gone beyond "reasonable suspicion," to *"probable cause,"* and had detained the Defendant, who was not free to go. In such coercive circumstances, sharply distinguishable from the scenario envisioned in *Brignoni–Ponce,* the *Miranda* warning is indispensable.

The Government's attempt to characterize this incident as a "routine traffic stop"—one lacking pressures that impair a detained person's free exercise of her Fifth Amendment privilege to such an extent that an officer must advise her of her Constitutional rights—is also unavailing. Indeed, the Government invokes a Supreme Court case that recites indicia of an "ordinary traffic stop" that are manifestly inapplicable to the present case. These indicia include the "presumptively temporary and brief" nature of such stops, their spontaneity, and their "exposure to public view." *Berkemer v. McCarty*, 468 U.S. 420, 437–39 & n. 27, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). In contrast, the Court here finds that because of the circumstances of this stop a "reasonable person" in Defendant's position would have understood herself to be in custody, and that the Agent should thus have advised her of her *Miranda* rights. *Id.* at 441–42 & n. 35, 86 S.Ct. 1602. This "reasonable understanding" would arise by virtue of the Agent's questions, which indicated a concern with immigration matters rather than traffic safety (*see* direct testimony of Agent Letourneau, tr. at 50 line 18 to 52 line 17); by virtue of the presence in her car of three persons who—whatever the legal status of their presence in the United States—were definitely not American citizens; by virtue of the temporal proximity of the stop to her picking up those persons; and by virtue of the isolation of the stop (it happened at night, and on a lightly-traveled stretch of public road (*see* direct testimony of Agent Peter Dunbar, tr. at 14 lines 17–23)).

■ The Court *does* accept the Government's contention that any spontaneous outbursts spoken by Defendant before Agent Letourneau started addressing her are admissible—including, but not necessarily limited to, her purported remarks, "What's goin' on? What did I do? What did I do wrong? What are you doing?" (tr. at 49 lines 20–22; mem. at 2). The Agent was, in addition, surely entitled to request that the vehicle's occupants produce identification and documentation proving that they were legally in the country.

Beyond that, however, with formal arrest of the occupants so highly probable, the Agent was obligated to precede any

questioning of these individuals with a recitation of their *Miranda* rights. Accordingly, excepting as noted above any spontaneous outbursts by Defendant, the Court deems inadmissible any statements made by Defendant between the time Government Agents began questioning her and the time she was advised of her *Miranda* rights. The Court thus GRANTS in part and DENIES in part Defendant's motion to suppress statements purportedly made by Defendant at the arrest scene.

The Court wishes to draw the Government's attention to Local Rule of Practice 10.1(a), which requires that all documents presented to the Court for filing have a "3 inch top margin on [the] first page," and "pages consecutively numbered." The Government's otherwise excellent, well-researched memorandum was not in compliance with these requirements.

For the record, the Court notes that the official transcript of the 30 July 1999 hearing reads, in part, "The Government's contention that it need not produce *Brady* impeachment material until after jury selection is clearly correct under *US v. [Avellino]*." (Decision of the Court, tr. at 5 line 24 to 6 line 2.) The sentence as recorded is a misstatement. The Court had intended to state, at that point, that the Government's contention "is clearly *incorrect*" under *United States v. Avellino,* 136 F.3d 249, 262 (2d Cir.1998).

### CONCLUSION

For the reasons stated above, it is hereby:

ORDERED that Defendant's motion for suppression of Defendant's statements purportedly made at the scene of the arrest prior to the time she was advised of her *Miranda* rights is **GRANTED in part and DENIED in part,** as detailed above; and

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this order by regular mail upon the parties to this action.

IT IS SO ORDERED.