**UNITED STATES of America, Appellee,**

v.

**Luis Hernando RAMIREZ, Defendant–Appellant.**

**No. 748, Docket 95–1197.**

United States Court of Appeals, Second Circuit.

Argued Dec. 19, 1995.

Decided March 22, 1996.

B. Alan Seidler, Nyack, New York, for Defendant–Appellant.

Andrew J. Frisch, Assistant United States Attorney, Brooklyn, New York (Zachary W. Carter, United States Attorney for the Eastern District of New York, Peter A. Norling,

Assistant United States Attorney, Brooklyn, New York, on the brief), for Appellee.

Before: KEARSE, MINER, and PARKER, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Luis Hernando Ramirez ("Ramirez") appeals from a judgment entered in the United States District Court for the Eastern District of New York, following a jury trial before Carol Bagley Amon, *Judge,* convicting him of possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) (1994). Ramirez was sentenced principally to 188 months' imprisonment, to be followed by a five-year term of supervised release. On appeal, he contends principally that the district court should have suppressed certain of his postarrest statements on the ground that they were made in response to questioning that followed his invocation of the right to remain silent. Finding no merit in any of Ramirez's contentions, we affirm the judgment of conviction.

## I. BACKGROUND

The circumstances underlying the present prosecution were described at trial principally by United States Drug Enforcement Administration ("DEA") Special Agents German Blanco and Keith Kruskall. Viewed in the light most favorable to the government, the trial evidence showed the following events.

A. *The Government's Evidence at Trial*

On August 18, 1994, as a result of conversations with a confidential informant, a team of some eight DEA agents, including Blanco and Kruskall, conducted a surveillance of Ramirez's apartment. At approximately 1:45 p.m., they observed Ramirez, whose name they did not then know, and the informant exit Ramirez's apartment house. Ramirez reentered and emerged carrying a box that he put into a black Maxima parked in front of the building. The informant drove off in another car; Ramirez drove off in the Maxima.

At approximately 3:25 p.m., Ramirez returned in the Maxima but drove past the apartment, proceeding to a pay telephone some five blocks away. A few minutes later, he drove by the apartment in the opposite direction and stared at Kruskall's surveillance vehicle. Ramirez parked a few blocks away. When first seen by the agents, Ramirez had been wearing a white T-shirt; shortly after staring at the surveillance vehicle, Ramirez reappeared with his shirt off. At about 6:00 p.m., Ramirez again drove past the apartment; this time he was wearing a dark T-shirt, and he was driving a Chevrolet. A few hours later, he drove by again; he was now wearing yet a different shirt, and he was driving a Buick. As he headed toward the black Maxima, in which he had earlier put the box, he was stopped and placed under arrest. He had in his possession two beepers.

Armed with a search warrant, the agents searched Ramirez's apartment. In a dresser in the master bedroom they found, *inter alia,* three additional beepers, Ramirez's Colombian passport, two Colombian identification cards bearing his photograph, and a current lease for the apartment in his name. In the second bedroom, the agents found three stacked boxes that contained a total of 74.866 kilograms of 82% pure cocaine. They also found in that room some children's clothing and toys. No identification documents for anyone other than Ramirez were found in the apartment.

At about 10:00 p.m., Ramirez was taken to the DEA office in Kruskall's car. En route, Blanco advised Ramirez of his *Miranda* rights (*Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). Ramirez indicated that he would speak with the agents, and Blanco asked him what his name was and who owned the cocaine. Ramirez responded that the agents knew his name and that their friend knew who owned the cocaine. When they arrived at the DEA office, Blanco again advised Ramirez of his rights, and Ramirez again indicated that he was willing to talk. Blanco asked who owned the cocaine; Ramirez again responded that the agents' friend knew who owned the cocaine. Blanco asked to whom the cocaine was to be delivered; Ramirez did not respond. When Blanco asked Ramirez what

price cocaine was then selling for, Ramirez responded that it was $18,000 per kilogram.

On the following morning, Kruskall and DEA Special Agent Frank Hornyak took Ramirez from the detention center in which he had been held overnight to court for his arraignment. Kruskall testified that, after they arrived in the marshal's office at the courthouse and were awaiting completion of Ramirez's processing, he asked Ramirez to whom the seized kilograms of cocaine belonged, and Ramirez responded " 'they were mine.' " Both Kruskall and Hornyak asked again, and Ramirez reiterated that the cocaine was his.

## B. *The Motion To Suppress the August 19 Statements*

Prior to trial, Ramirez moved to suppress, *inter alia*, the statements he had made to Kruskall and Hornyak on August 19 (the "August 19 statements"), arguing that those statements had been taken in violation of his right to remain silent because they were responses to questions asked after he had invoked that right. The district court held an evidentiary hearing at which the government produced the testimony of Blanco, Kruskall, and Hornyak.

Blanco described his August 18 questioning and Ramirez's responses in the car and at the DEA office. In the car, Blanco, a native speaker of Spanish, advised Ramirez in Spanish of his constitutional rights. After advising Ramirez of each right, and again after having advised him of all of his rights, Blanco asked Ramirez if he understood. Each time, Ramirez answered "si." (Suppression Hearing Transcript, October 27, 1994, at 19.) Blanco asked whether Ramirez was willing to answer questions, and once again Ramirez answered "si." (*Id.* 19–20.) Blanco then asked questions in English, and Ramirez responded in English. Blanco asked Ramirez's name; Ramirez answered, " 'You know my name.' " (*Id.* at 20) Blanco asked to whom the cocaine belonged; Ramirez answered " 'Your friend knows who the cocaine belong[ ]s to.' " (*Id.*) Blanco asked to whom Ramirez was supposed to give the cocaine; Ramirez made no response. Blanco testified that no further questions were

asked in the car because, "I felt that the defendant was being sarcastic, and I saw that I was not going anywhere at that point with the defendant." (*Id.* at 21).

After they arrived at the DEA office and Ramirez had been photographed and fingerprinted, Blanco again advised him in Spanish of his rights, as he had done in the car. Ramirez again stated that he understood each of his rights and again he agreed to answer questions. Blanco testified about the exchange, which was in English, that followed:

Q What, if anything, did you ask the defendant?

A Well, I asked him the personality [*sic*] information:

Name, address, question[s] regarding his family, but then I asked him more specific questions regarding the cocaine, the drug deal. And I asked him who did the cocaine belong to the second time. Again, he answered the second time my friend knew who the cocaine belonged to.

. . . .

THE COURT: Did you understand that to be a reference to the [confidential informant]?

THE WITNESS: No, Your Honor.

THE COURT: That is not who you thought he was referring to?

THE WITNESS: I didn't have any idea who he was referring to.

Q . . . . Did you ask him anything else other than who did the cocaine belong to?

A Yes, I asked him question[s] such as who was he going to give the cocaine to, [to] which he did not give me a reply.

I asked him questions as to who he was working for. Again, he didn't answer—give me a—excuse me.

And then I asked him how much was a kilo of cocaine going for on the street, and to that he did give me an[ ] answer. He stated that it was $18,000 for one kilo of cocaine.

Q Now, in order to convince the defendant to cooperate further did you say anything to the defendant about the possible penalties that he was facing?

A  Yes.

Q  What did you say, if anything?

A  I told him he was facing a minimum of ten years in prison due to the volume of cocaine.

. . . .

Q  Did the defendant say anything in response to this?

A  No.

Q  At this point did you cease questioning him?

A  Yes, I did.

Q  Why was that?

A  Again, I felt that I was not getting anywhere with the defendant, so I didn't see any need for me to continue questioning the defendant.

(*Id.* 24–25.)

Kruskall confirmed Blanco's testimony as to the August 18 questioning, and he testified as follows with respect to questioning by himself and Hornyak on the morning of August 19, after Ramirez was taken to the courthouse:

Q  While you were . . . in that Marshal's waiting area, did you ask Mr. Ramirez anything?

A  I asked him whose kilos were in the house.

Q  Was this question in English?

A  In English.

Q  What did Mr. Ramirez say in response to this question?

A  Said that they were his.

Q  Did you then ask Mr. Ramirez anything else?

A  I said the kilos we seized last night were your kilos.

Q  What, if anything, did Mr. Ramirez say?

A  Yes, they were mine.

Q  Did you hear Special Agent Hornyak then ask Mr. Ramirez anything?

A  Special Agent Hornyak, for a third time to clarify, said 75 kilos we seized in your house last night were your kilos. He said, yes, they were mine.

. . . .

Q  Did Special Agent Hornyak then tell Mr. Ramirez—with respect to his possible penalties did he tell him anything?

A  Special Agent Hornyak said that he would go to jail for a long time and Mr. Ramirez responded it was his life.

Q  Can you tell the Court why you and Special Agent Hornyak asked essentially the same question three times?

A  I wanted to be clear as to his answer.  I couldn't believe what he said.

Q  Was it because you were afraid that Mr. Ramirez had not understood you the first time or the first two times?

A  No.  I just wanted to make sure—absolutely sure that was his answer.

(*Id.* 67–68.)

Hornyak described Ramirez's August 19 statements in the same way.  When asked why he and Kruskall had asked the same question repeatedly, Hornyak stated, "I was just surprised that he would claim all the kilos were his."  (*Id.* 81.)

Blanco, Kruskall, and Hornyak all testified that Ramirez never indicated that he had an attorney or wanted to consult with an attorney.  Ramirez did not testify at the suppression hearing.

C.  *The District Court's Ruling*

At the close of the suppression hearing, the district court denied the motion to suppress Ramirez's August 19 statements, stating that "[u]nder all the circumstances it does not seem to this Court that he was invoking any right to remain silent by not responding to those two [August 18] questions."  (*Id.* at 92.)  The court credited the testimony of the agents that Ramirez

was advised of his Miranda warnings on two different occasions and that he said he understood his rights and that he agreed to speak to them on the two different occasions.  There doesn't appear to have been any circumstances to suggest that apart from the issue of the Miranda warnings, per se, that the statements were involuntary, there was any coercion attached to any of these statements, or that his will was overborne.

I don't see a basis that the agents were required to advise him of his Miranda warnings the next day, having advised him of his Miranda warnings on two different occasions. . . .

As I understood it, he answered a third question after he didn't answer the other two which would suggest that he didn't intend to invoke that right. . . .

(*Id.* 94–95.) The court concluded that, absent some *per se* rule that had not been brought to the court's attention, Ramirez's silence in the wake of certain questions did not invoke his right not to be asked other questions. The court invited additional briefing on that issue. In the meantime, the August 19 statements were admitted at trial.

After the jury found Ramirez guilty, the district court revisited the constitutional issue at Ramirez's sentencing hearing, both sides having submitted additional briefs. The court adhered to its original decision:

As I had earlier ruled, a defendant's silence in response to certain questions by the police is not necessarily sufficient to invoke any right to remain silent after he's knowingly and voluntarily waived this right by responding to police interrogation.

(Sentencing Hearing Transcript, March 23, 1995 ("Sent.Tr."), at 6.) The court cited *Bradley v. Meachum*, 918 F.2d 338, 342–43 (2d Cir.1990), *cert. denied*, 501 U.S. 1221, 111 S.Ct. 2835, 115 L.Ed.2d 1004 (1991), for the proposition that, in order to invoke the right to remain silent, "there must be an indication that the defendant has invoked th[at] right. . . ." (Sent. Tr. at 6.)

The district court also found relevant the Supreme Court's decision in *Davis v. United States*, —— U.S. ——, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), which stated that a suspect, in order to require law enforcement officers to cease questioning because of his desire to consult with counsel, must unequivocally and unambiguously state that desire. The district court noted that other courts had applied the same standard with respect to a suspect's desire to remain silent and had held that a suspect's ambiguous or equivocal statements in response to some questions cannot conclusively be viewed as an attempt to exercise his right to remain silent. The district court adopted the standard that, once a suspect has knowingly and voluntarily waived his right to remain silent and has answered some questions, if he thereafter wishes to invoke his right to remain silent he " 'must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be assertion of the right to remain silent.' " (Sent. Tr. 8–9 (quoting *Coleman v. Singletary*, 30 F.3d 1420, 1424 (11th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1801, 131 L.Ed.2d 727 (1995)).)

Applying that standard to the present case, the court found that Ramirez had not invoked his right to remain silent:

The court finds in this case that the defendant's failure to answer the few questions posed by Agent Blanco in the midst of answering other questions was not an unequivocal invocation of his right to remain silent.

The defendant in this case answered questions before and after the several questions that he didn't respond to. Under these circumstances, this is simply not the type of unambiguous statement of a right to remain silent.

I think it is also of note that the question asked by Agent Krushahl [*sic*] at the courthouse the following day after the defendant's arrest was in fact one of the questions that he had responded to during Agent Blanco's questioning, both in the car and the station, that question being who the cocaine belonged to. The defendant had answered that question or responded, I should say, to that question on both occasions, indicating that you know who it is that the cocaine belongs to.

. . . .

Assessing all of the testimony, . . . I don't think that the simple failure to answer the third question would have constituted, under the Davis and Singletary decisions, an invocation of the right to remain silent under any circumstances.

In sum, the court concludes that the defendant did not unequivocally invoke his

right to remain silent and the statements were properly admitted at trial.

I should note that there was an argument made that the agents' assessment of the defendant as being a wise guy or somehow flip during their questioning of him somehow translated it as their concurrence in the view that he was exercising a right to remain [si]lent.

I do not accept that interpretation. I think a defendant who gives flippant answers to questions or, in the agents' view acts as a wise guy, that ... does not translate into an invocation of the right to remain silent.

(Sent. Tr. 9–10.)

Judgment was entered sentencing Ramirez as indicated above, and this appeal followed.

## II. DISCUSSION

On appeal, Ramirez contends principally that the district court should have granted his motion to suppress his August 19 statements that he owned the seized cocaine on the ground that by refusing to answer questions on August 18, he had invoked his right to remain silent. We reject this contention substantially for the reasons stated by the district court.

### A. The August 19 Statements

■■■ *Miranda* warnings are intended principally to safeguard the suspect's privilege against self-incrimination. *See, e.g., Weaver v. Brenner*, 40 F.3d 527, 534 (2d Cir.1994). To that end, law enforcement agents conducting a custodial interrogation are required to advise a suspect, *inter alia*, that he has the right to remain silent and the right to consult with counsel. If the government wishes to introduce into evidence at trial a statement made during such an interrogation, it has the burden of establishing by a preponderance of the evidence that the suspect waived his *Miranda* rights and that his statement was "truly the product of free choice." *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir.1991).

■■■ If, before or during the interrogation, the suspect states unequivocally that he wishes to remain silent and refuses to answer

questions, interrogation ordinarily must cease. *See, e.g., Campaneria v. Reid*, 891 F.2d 1014, 1021 (2d Cir.1989), *cert. denied*, 499 U.S. 949, 111 S.Ct. 1419, 113 L.Ed.2d 471 (1991). A suspect need not rely on talismanic phrases or any special combination of words to invoke his Fifth Amendment right to remain silent. *See, e.g., Quinn v. United States*, 349 U.S. 155, 162–63, 75 S.Ct. 668, 673, 99 L.Ed. 964 (1955). We have ruled, for example, that a suspect who acknowledged that he understood his *Miranda* rights by nodding and then remained silent in response to all pedigree questions had thereby sufficiently asserted his right to remain silent. *See United States v. Montana*, 958 F.2d 516, 518 (2d Cir.1992); *but see id.* at 519 (suspect's later volunteering of information constituted waiver of the right). Once a suspect has unequivocally invoked his right to remain silent "whether in the form of refusing to answer questions or asking that an ongoing interrogation be terminated, his request must be scrupulously honored." *Campaneria v. Reid*, 891 F.2d at 1021 (internal quotation marks omitted).

In some circumstances it may be unclear whether a suspect has invoked his right to remain silent. We have stated that where a suspect has invoked his right equivocally or ambiguously, the officers are permitted to ask narrow questions only for the purpose of clarifying the ambiguity. *Id.* In some circumstances, however, a suspect's statement as to his willingness or unwillingness to answer questions, or his silence in response to some questions, does not constitute even an ambiguous or equivocal invocation of the right to remain silent. In *Bradley v. Meachum*, 918 F.2d 338, the suspect received *Miranda* warnings and indicated his willingness to talk to the police. When asked about the robbery at issue, Bradley first stated that he was not going to say whether he was involved or not; he then immediately denied any connection to the robbery. In the ensuing one-hour colloquy, Bradley talked about several subjects, including telling the officer that he had no alibi but then proceeding to account for his whereabouts at the time of the crime. The district court ruled that Bradley's initial statement constituted an in-

vocation of his right to remain silent. We reversed, ruling that, in light of what followed, Bradley's initial statement that he would not say whether or not he had been involved was "part of an ongoing stream of speech," and was "n[either] ... an invocation of the right to remain silent," *id.* at 342, "no[r] the functional equivalent of silence," *id.* at 343. *See also United States v. D'Antoni,* 856 F.2d 975, 980–81 (7th Cir.1988) (where, in response to inquiry as to whether he was willing to answer questions, suspect stated that he had already given all the information he had, but he then answered further questions, that statement was not an assertion of the right to remain silent). In support of our holding in *Bradley,* we relied on, *inter alia, United States v. Lorenzo,* 570 F.2d 294, 297–98 (9th Cir.1978), which held that though a suspect may, if he chooses, selectively waive his Fifth Amendment right by indicating that he will respond to some questions but not to others, his simple failure to respond to one question, after he had responded to others, does not constitute invocation of the right to remain silent.

■ The district court's denial of Ramirez's suppression motion was consistent with these principles. There is no dispute that Ramirez was properly given his *Miranda* warnings twice on August 18 and that on each occasion he acknowledged his understanding and agreed to speak with the officers. On the first occasion, Blanco asked him three questions, and Ramirez responded to two and was silent as to the third. On the second occasion, again having been given *Miranda* warnings and again agreeing to answer questions, Ramirez again answered most of Blanco's questions: Blanco asked pedigree questions, which were answered; he asked to whom the cocaine belonged, to which Ramirez responded, as he had earlier, that "[y]our friend" knows to whom it belongs. Ramirez did not respond to two further questions by Blanco, to wit, to whom Ramirez was to give the cocaine and for whom Ramirez was working; Ramirez then answered Blanco's question as to the current price for a kilogram of cocaine.

We conclude that in these circumstances Ramirez's silence in the wake of two questions, while answering others, did not consti-

tute even an equivocal invocation of his right to remain silent. To the extent that the Supreme Court's ruling in *Davis v. United States,* — U.S. ——, 114 S.Ct. 2350, 129 L.Ed.2d 362, which addressed the question of the need for clarity in a suspect's invocation of the right to counsel, may be applied to a suspect's right to remain silent, it confirms the correctness of the district court's ruling. In *Davis,* the Supreme Court noted that when a suspect during a custodial interrogation has clearly asserted his Fifth Amendment right to consult with counsel, the officers must stop questioning the subject immediately, *see Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). But the *Davis* Court stated that when a suspect has knowingly and voluntarily waived his *Miranda* rights and then "makes a reference to counsel that is insufficiently clear to invoke the *Edwards* prohibition on further questioning," *Davis v. United States,* — U.S. at ——, 114 S.Ct. at 2352, the "law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney," *id.* at ——, 114 S.Ct. at 2356. Assuming, *arguendo,* that a parallel standard applies to the right to remain silent, Ramirez's nonresponse to two questions, having answered others, did not require the cessation of questioning since his silence certainly did not constitute a "clear[ ]" request that all further questioning cease.

The district court found no indication in the record that Ramirez, having twice indicated that he understood and waived his *Miranda* rights on the night of August 18, was not aware of those rights on the morning of August 19. Since Ramirez had been properly advised of his rights and agreed to answer questions, and thereafter neither remained entirely silent nor stated that he wished to be asked no further questions but instead simply answered some questions and did not respond to others, we agree with the district court's conclusion that Ramirez did not invoke his right to remain silent, and that the agents' further questions did not violate his Fifth Amendment rights.

## B. *Other Contentions*

■ Ramirez also argues, *inter alia,* that the evidence at trial was insufficient to con-

**306**

vict him. We disagree, for even without his postarrest confession, the evidence, taken in the light most favorable to the government, *see, e.g., Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and with all inferences drawn in the government's favor, *see, e.g., United States v. Weiss,* 930 F.2d 185, 191 (2d Cir.), *cert. denied,* 502 U.S. 842, 112 S.Ct. 133, 116 L.Ed.2d 100 (1991), was ample.

The government's proof at trial included evidence that the apartment in which the agents found the three boxes containing approximately 75 kilograms of 82% pure cocaine was leased to Ramirez; that in the master bedroom were Ramirez's passport, two identification cards bearing his photograph, and three beepers (in addition to the two Ramirez was wearing when he was arrested); that after Ramirez left the apartment carrying a box and drove off in his Maxima, he returned, drove past his apartment to use a pay telephone some five blocks away, although there was a cellular telephone in his apartment; that Ramirez then drove past his apartment again, staring at the two of the surveilling agents; and that during the afternoon and evening, Ramirez repeatedly drove past the apartment, changed cars twice, and wore several different outfits.

The government's evidence that Ramirez was the sole tenant and sole adult occupant of the apartment, that the cocaine was stacked up in an open room of the apartment, and that Ramirez took evasive actions after becoming aware of the agents' surveillance was sufficient to permit the jury to infer beyond a reasonable doubt that the cocaine found in the apartment belonged to Ramirez.

■ Ramirez's contention that he countered the government's case by testifying that he did not own the cocaine and by offering innocent explanations for his elusive behavior and his possession of beepers goes only to the weight of the evidence. The weight of the evidence is a matter for argument to the jury, not a ground for reversal on appeal. *See, e.g., United States v. Roman,* 870 F.2d 65, 71 (2d Cir.), *cert. denied,* 490 U.S. 1109, 109 S.Ct. 3164, 104 L.Ed.2d 1026 (1989). We note also that the jury was entitled to view the improbability of Ramirez's explanations as further proof of his guilt. *See, e.g., United States v. Stanley,* 928

F.2d 575, 577 (2d Cir.) ("the jury [is] entitled to disbelieve [the defendant's] testimony, and use its disbelief to supplement the other evidence against him" adduced by the government), *cert. denied,* 502 U.S. 845, 112 S.Ct. 141, 116 L.Ed.2d 108 (1991). Ramirez's disclaimer of ownership, for example, consisted of the claim that the cocaine had been left in his apartment on the morning of August 18 by a prospective subtenant, one Osa, whom Ramirez had met recently and whose address Ramirez did not know. Ramirez and Osa had not entered into any lease or other written agreement for Osa's proposed tenancy. Taking note of Ramirez's statement to Blanco that the current price for one kilogram of cocaine was $18,000, the jury was plainly entitled to disbelieve Ramirez's testimony that a bare acquaintance who had no indicia of entitlement to enter the apartment had left him with some 75 kilograms of cocaine worth $1,350,000.

Ramirez's other contentions do not warrant discussion.

### CONCLUSION

We have considered all of Ramirez's arguments on this appeal and have found them to be without merit. The judgment of conviction is affirmed.