**UNITED STATES of America,**

v.

**Gordon PLUGH, Defendant.**

**No. 06–CR–6010 CJS.**

United States District Court,
W.D. New York.

June 11, 2007.

Tiffany H. Lee, U.S. Attorney's Office, Rochester, NY, for United States of America.

Mark D. Hosken, Federal Public Defender, Rochester, NY, for Defendant.

## DECISION AND ORDER

CHARLES J. SIRAGUSA, District Judge.

### INTRODUCTION

The defendant, Gordon Plugh, stands accused in a nine-count superseding indictment charging him with crimes relating to child pornography. In the defendant's omnibus motion, he moved to suppress physical evidence seized, as well as statements made on July 14, 2005. He also moved to suppress statements given following his arrest on September 28, 2005.

In regard to the defendant's application, an evidentiary hearing was held on April 23, 2007. Special Agents James McCaffrey and Joseph McArdle of the Federal Bureau of Investigation testified as witnesses for the government, and April Field, John Plugh and the defendant him-

self, Gordon Plugh, testified as witnesses for the defense.

The Court having considered the testimony presented and exhibits received into evidence at the hearing, and the Court having made evaluations regarding credibility, makes the following findings of fact and conclusions of law, and grants in part and denies in part, the defendant's motion to suppress physical evidence and statements.

## FINDINGS OF FACT

Joseph McArdle ("McArdle") is employed as special agent with Federal Bureau of Investigation ("FBI") and has been so employed since September of 2004. James McCaffrey ("McCaffrey") is also employed as special agent with the FBI, and he has been so employed since September of 2004. On July 14, 2005, McArdle and McCaffrey, in connection with their duties with the FBI went to the residence at 480 North Landing Road, Rochester, New York. More specifically, the FBI office in Rochester had received a lead from the Oklahoma City Division of the FBI about a possible computer hacking occurrence from that location, in which a website had been hacked into and used as a repository for child pornography images. The FBI in Oklahoma City observed log files on the hacked web site indicating the Internet Protocol ("IP") addresses which had visited the section of the site containing the child pornography and which had subsequently downloaded child pornography images. One of the IP addresses identified as downloading child pornography related to the residence at 480 North Landing Road.

McArdle and McCaffrey drove together, arriving at 480 North Landing Road between 11:30 a.m. and 12:00 p.m. on July 14, 2005. They were both dressed in plain clothes, and, while they were armed, their firearms were concealed by their clothing. McArdle and McCaffrey exited their vehicle, proceeded to the side door of 480 North Landing Road, and knocked on it. April Field ("Field"), then the defendant's fiancée and now his wife, opened the door and within moments was joined by the defendant, Gordon Plugh, who was approximately thirty-three years old at the time.[1] McArdle identified himself and McCaffrey as FBI agents, and both McArdle and McCaffrey showed the defendant and Field their credentials. After the defendant and Field identified themselves, McArdle, who was doing the talking, indicated that he and McCaffrey were investigating a matter out of the Oklahoma Division that involved computers and child pornography. McArdle then asked the defendant and Field if he and McCaffrey could come inside and speak to them regarding the investigation. The defendant and Field responding by inviting McArdle and McCaffrey inside of 480 North Landing Road. Once inside the residence in the foyer area, McArdle reiterated that he and McCaffrey were working a lead or investigation out of Oklahoma City. He further explained that there was a website that was hacked into that was found to be a repository for child pornography, and that the reason he and McCaffrey were there was because an IP address involved in the investigation came back to 480 North Landing Road.

The defendant and Field indicated in response that they were against child pornography, that they did not believe in that type of thing, and they didn't know anything about it. They added that they didn't know how their computer would

---

1. As of the date of the hearing on April 23, 2007, the defendant testified that he was thirty-five years old.

have been identified as downloading from that site. The defendant then indicated that he did in fact have a couple of computers in the house, one in the dining room/living room, which, from their vantage point in the foyer, McArdle and McCaffrey could observe, and another one on the second floor. The defendant explained that the computers worked on a wireless network and that he employed security measures on the network to provide a fire wall.

McArdle indicated to the defendant that the specific time period involved in the downloads was November 2004. The defendant stated that, during that time frame, he recalled having a Trojan, which is a virus, on his computer, causing it to work improperly and sporadically, and, as a result, he said he threw his hard drive away in the garbage and purchased a new one. However, he stated that, after purchasing the new hard drive, the computer still did not work very well, and, as a result, he was vigilant about having anti-spyware software on the computer. While the defendant and Field were, as of July 14, 2005, the only residents of 480 North Landing Road, the defendant informed McArdle and McCaffrey that previously, until October of 2004, he and Field had a female roommate, whom he did not identify.

McArdle then asked the defendant if he and McCaffrey could speak to him privately away from Field. The defendant agreed and the three of them went outside. Once outside, McArdle asked the defendant if he could explain how an IP address with an account in Field's name and associated with 480 North Landing Road was identified as downloading child pornography. The defendant said that he had no answer for that, and then, when asked if he could have downloaded child pornography accidently, he replied no. McArdle indicated to the defendant that, in the past, the FBI had found IP information to be fairly credible, and that the only way to be certain as to whether the correct IP address had been obtained was to have the computers in the residence forensically examined by FBI experts in Buffalo. In that regard, McArdle stated to the defendant, "You have a choice. You can let us take them or not let us take them. You can resolve the matter by letting us take them. If you don't allow us to take them, the investigation will continue." At first the defendant was hesitant. He indicated that he did not want to be without computers and Internet access at the house. He indicated that he was using the computer to search for work and that Field used the Internet to play games. However, he then indicated that he would let McArdle and McCaffrey take the computer from upstairs but not the one from downstairs.

The defendant, McArdle, and McCaffrey went back inside the house, after which the defendant and McCaffrey proceeded upstairs, while McArdle waited downstairs with Field. Using a tool, the defendant unscrewed two hard drives from the computer on the second floor and handed them to McCaffrey. The defendant and McCaffrey then went back downstairs. About five minutes had elapsed from the time they went upstairs until the time they returned downstairs. When the defendant and McCaffrey were back downstairs, McArdle produced a form, received into evidence as Exhibit # 1 and captioned "Consent to Search Computer(s)." The form consisted of two pages, but only page one was applicable to the situation at hand. After McArdle read page one of the form to the defendant and showed it to him, the defendant signed page one of the form in the presence of McArdle and McCaffrey, who witnessed his signature. Before the defendant signed page one of the form, McArdle asked him if he had any questions and the defendant answered that he

did not. By its plain reading, in signing page one of the form, the defendant gave the FBI permission to search the two hard drives that he had handed to McCaffrey. Significantly, page one of the form includes the following language: "I have been advised of my right to refuse to consent to this search, and I give permission for this search, freely and voluntarily, and not as the result of threats or promises of any kind." In fact no threats or promises were made by McArdle or McCaffrey to the defendant to get him to sign the form, and at no time prior to signing the form did the defendant ever indicate that he wanted to consult with a lawyer. Further, the defendant was never restrained in any fashion. Moreover, the defendant did not exhibit any signs that he was under the influence of alcohol, but rather was coherent. After the defendant signed the consent form, McArdle provided him with a receipt for the two hard drives, which was received into evidence as Exhibit # 2 and which was signed both by McArdle and the defendant. After providing the defendant with the receipt, McArdle and McCaffrey left 480 North Landing Road with the two hard drives. The total time that McArdle and McCaffrey were at 480 North Landing Road on July 14, 2005, was less than an hour.

Subsequently, on September 28, 2005, after a criminal complaint had been filed and an arrest warrant issued, McArdle along with FBI Special Agents Robert Kocher ("Kocher"), Doug Soika, Casey Cardi, and John Neal, went to 3 Hillside Drive, Wayland, New York, the residence of John Plugh, the defendant's father, to arrest the defendant. They arrived at 3 Hillside Drive at about 11:30 a.m. After arriving, McArdle and the other agents approached the door to the residence. They were wearing protective vests with the letters "FBI" on the vests. McArdle knocked on the door, which was answered by John Plugh. McArdle explained to the defendant's father that he needed to know where "Gordon was." In response, John Plugh indicated the other room. McArdle proceeded to walk past the defendant's father, and he arrested and handcuffed the defendant in the family room of the residence. The defendant, who had just gotten out of the shower, was allowed to get dressed and directed to take a seat in the family room.

McArdle, using an FBI Advice of Rights form, received into evidence as Exhibit # 3, advised the defendant of his *Miranda*[2] rights at approximately 11:47 a.m. McArdle read the form verbatim to the defendant. The first part of the form lists the *Miranda* warnings as follows:

### YOUR RIGHTS

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

The second part of the form contains the following language, followed by a signature line:

---

**2.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

## WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present.

After reading the form verbatim to the defendant, McArdle, referring to the waiver of rights, said, "If you agree with the statement you can sign the form." The defendant said that he understood his rights, because he previously worked for the Department of Corrections in the state of Arizona. He added that he was uncertain whether he even wanted a lawyer or wanted to talk. However, in response to McArdle's specific direction to sign the form if he agreed with the waiver, the defendant stated that he did not want to sign anything at that time. At the hearing when cross-examined by defense counsel on this point, McArdle testified:

Q. And he was confused whether or not he wanted to sign the form, right?
A. No, it's not. He indicated he did not want to sign the form.
Q. That much he was not confused about. He told you unequivocally that he did not want to sign the form, correct?
A. That is correct.

(Hearing Transcript, at 22.) Consequently, McArdle wrote on the FBI Advice of Rights form that the defendant "refused to sign" the form, then he and Kocher signed the form themselves, and the interview of the defendant ceased.

McArdle and Kocher then placed the defendant in their vehicle for transport back to the Federal Building in Rochester. Kocher was driving, the defendant was in the front passenger seat, and McArdle was positioned in the second row in the middle between Kocher and the defendant.

During the ride to Rochester, which took about an hour and fifteen minutes, McArdle and Kocher talked to the defendant about why he had been arrested and told the defendant that child pornography had been found on the hard drives. They explained to the defendant that they were taking him to the Federal Building in Rochester where he would be booked by the Marshal's Service, and where he would be brought to a court appearance before a magistrate judge. They represented to the defendant that he had indicated that he did not know if he wanted to sign the sheet or know whether he needed a lawyer or know whether to speak to them. However, in representing to the defendant that he had previously indicated that he did not know if he wanted to sign the sheet, McArdle and Kocher were not being accurate, but rather were being misleading. In that regard, McArdle himself, as indicated above, testified at the hearing that the defendant unequivocally stated he did not want to sign the form. McArdle and Kocher also stated that they did not care if he wanted to talk to them, and that it was up to him to do what he wanted to do. They did explain, however, that any sort of cooperation that he provided would be relayed to the prosecutor, Assistant United States Attorney ("AUSA") Lee. The defendant responded by asking what cooperation meant, and it was explained to him that if he wanted to make statements he had to first be re-advised of his rights and then, after that, if he made statements, McArdle and Kocher would relay his cooperation to the AUSA. McArdle and Kocher may have repeated two times or more that any cooperation on the part of the defendant would be brought to the attention of the AUSA. However, in that regard, McArdle and Kocher clarified that they could not make the defendant any promises and had no authority to do so. McArdle and Kocher put an end to the discussion by telling the defendant that they were not going to discuss the specifics of the case unless he was re-advised of his rights and waived them, and by telling him

not to talk to them about the case. Small talk ensued for the remainder of the defendant's transport to Rochester.

When McArdle, Kocher, and the defendant arrived at the Federal Building in Rochester, the defendant was taken to an upstairs office and placed in an interview room in the rear of the office where he was given some water. He was advised that he was going to be taken to the Marshal for booking, and if he wanted to make any statements, this was the time. At this point, the defendant indicated that he would make statements, and he was re-advised of his rights at approximately 1:22 p.m., this time by Kocher who read to him a second FBI Advice of Rights form, received into evidence as Exhibit # 4. The defendant signed the form and then gave a statement. The defendant, who could read and write [3], was calm and cooperative. No threats or promises were made to the defendant to get him to talk to the police. The defendant never specifically requested an attorney, nor did he ever specifically indicate that he did not want to speak with law enforcement. In sum and substance, the defendant indicated that he had downloaded the child pornography from the website located in the Oklahoma City territory. He further indicated that he had fabricated the story about the Trojan virus being on the computer, and said that he hoped that the FBI would just take the computers and leave and go after the major offenders.

## CONCLUSIONS OF LAW

### A. Suppression of Physical Evidence

The defendant has moved to suppress the two hard drives acquired by McArdle and McCaffrey on July 14, 2005, as well as all the evidence derived from the hard drives. In that regard, he argues that the seizure of the hard drives was violative of his Fourth Amendment rights. The Government opposes the defendant's application and maintains that the taking of the hard drives was lawful based upon the defendant's voluntary consent.

The general rule is that all warrantless searches, even when based on probable cause, are "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). One such exception would be a consent search. *United States v. Kon Yu–Leung*, 910 F.2d 33, 40–41 (2d Cir.1990). The Government, of course, bears the burden of establishing by a preponderance of evidence that consent was voluntarily given. *United States v. Buettner–Janusch*, 646 F.2d 759, 764 (2d Cir.1981). To be voluntary means that the consent was obtained without coercion. *Schneckloth v. Bustamonte*, 412 U.S. 218, 228, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In that regard, voluntariness is determined based upon the totality of circumstances, with a view as to whether consent was the product of free choice rather than merely the acquiescence to authority. *Schneckloth v. Bustamonte*, 412 U.S. at 226, 93 S.Ct. 2041; *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir.1993); *United States v. $19,047.00 in U.S. Currency*, 95 F.3d 248, 252 (2d Cir.1996). As to the validity of a consent search, the Second Circuit has offered the following guidance:

It is by now well established that while a warrantless search of a home is generally unreasonable and therefore violates the Fourth Amendment, which proscribes "unreasonable searches," an individual may consent to a search, thereby

---

**3.** The defendant, when cross-examined by the Government at the hearing about an affidavit he had given in support of his suppression applications, acknowledged that he could read and write.

rendering it reasonable. *See United States v. Kon Yu–Leung,* 910 F.2d 33, 40–41 (2d Cir.1990) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 226–27, 93 S.Ct. 2041, 2043–44, 2047–48, 36 L.Ed.2d 854 (1973)); *see also United States v. Wilson,* 11 F.3d 346, 351 (2d Cir.1993), *cert. denied,* 511 U.S. 1025, 114 S.Ct. 1415, 128 L.Ed.2d 86 (1994). To ascertain whether consent is valid, courts examine the " 'totality of all the circumstances' " to determine whether the consent was "a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *Wilson,* 11 F.3d at 351 (quoting *Schneckloth,* 412 U.S. at 227, 93 S.Ct. at 2048; other citations omitted); *see also Yu–Leung,* 910 F.2d at 41.

It is also well established that the concept of knowing and intelligent waiver, which is strictly applied to rights involving a fair criminal trial, does not govern in the Fourth Amendment context. *See Schneckloth,* 412 U.S. at 241–42, 93 S.Ct. at 2055–56 (explicating "vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment"); *see also Rodriguez,* 497 U.S. at 183, 110 S.Ct. at 2798–99. This is so because the Fourth Amendment prohibits not all searches and seizures, but only those that are "unreasonable". *See Rodriguez,* 497 U.S. at 183, 110 S.Ct. at 2798. So long as the police do not coerce consent, a search conducted on the basis of consent is not an unreasonable search. *Schneckloth,* 412 U.S. at 228, 93 S.Ct. at 2048. Therefore, knowledge of the right to refuse consent is not a requirement to a finding of voluntariness, *id.* at 231–33, 93 S.Ct. at 2049–50, although it may be a factor in ascertaining whether the consent was coerced. *Id.* at 248–49, 93 S.Ct. at 2058–59; *see also Yu–Leung,* 910 F.2d at 41.

Recent Supreme Court decisions emphasize both that only unreasonable searches are proscribed by the Fourth Amendment, and that the issue of reasonableness is to be measured by an objective standard.

*United States v. Garcia,* 56 F.3d 418, 422–23 (2d Cir.1995).

██ Applying these applicable principles of law to its findings of fact, the Court concludes that the Government has established by a preponderance of evidence that the defendant's consent to allow McArdle and McCaffrey to take possession of the two hard drives and his consent to have the hard drives forensically searched, were voluntary. In reaching its conclusion, the Court considers the totality of circumstances: First, as of July 14, 2005, the defendant was approximately thirty-three years old, could read and write, and was familiar with his *Miranda* rights as a result of his prior experience with the Arizona Department of Corrections. Second, McArdle and McCaffrey arrived at the Landing Road address in the late morning of July 14, 2005, between about 11:30 a.m. and 12:00 p.m. Third, the defendant was not alone, but was in the company of his then fiancée, Field. Fourth, the defendant granted McArdle and McCaffrey permission to come inside his residence at 480 North Landing Road. Fifth, although McArdle and McCaffrey were armed, their weapons were not visible. Sixth, McArdle and McCaffrey accurately explained the purpose of their presence at the defendant's residence. Seventh, before the defendant gave possession of the two hard drives to McCaffrey, McArdle explained to him, "You have a choice. You can let us take them or not let us take them. You can resolve the matter by letting us take them. If you don't allow us to take them, the investigation will continue." Eighth, the defendant responded by agreeing to

provide the hard drives for the upstairs computer, but not for the downstairs computer. Ninth, as to his agreement to allow the FBI to forensically examine the hard drives, the defendant signed a written consent form (Exhibit # 1) that was read aloud to him by McArdle before he signed it and which contained the following language: "I have been advised of my right to refuse to consent to this search, and I give permission for this search, freely and voluntarily, and not as the result of threats or promises of any kind." Tenth, before asking the defendant to sign the consent form, McArdle asked the defendant if he had any questions and the defendant replied that he did not. Eleventh, the defendant signed a receipt (Exhibit # 2) for the two hard drives. Twelfth, the defendant was never restrained in any fashion on July 14, 2005, and, as discussed below, was clearly not in custody. Thirteenth, McArdle and McCaffrey never made the defendant any promises or threatened him in any way to obtain his consent. Fourteenth, the defendant never, at any time on July 14, 2005, asked to consult with an attorney. Finally, the defendant was coherent and did not exhibit any signs of intoxication.

## B. Suppression of Statements

█ It is, of course, clear that the Government may not use any statements obtained from a defendant, whether exculpatory or inculpatory, which were the product of custodial interrogation, unless prior to any questioning the defendant was advised of his constitutional rights and knowingly, intelligently and voluntarily waived such rights. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Colorado v. Spring*, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987); *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Additionally, it is well settled that a defendant's statements must be voluntary based on the "totality of the circumstances." *Miller v.*

*Fenton*, 474 U.S. 104, 112, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). A statement is not voluntary if it is obtained by any type of physical or psychological coercion or by improper inducement so that a defendant's will was overborne. *Haynes v. State of Washington*, 373 U.S. 503, 513–14, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). The Government bears the burden of proving by a preponderance of the evidence both that a defendant, having been advised of his constitutional rights guaranteed under *Miranda*, knowingly, intelligently and voluntarily waived his rights, and that any statements that he made were voluntary. *Lego v. Twomey*, 404 U.S. 477, 482–89, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

█ However, for *Miranda* to apply, a defendant must be in custody. *United States v. Titemore*, 437 F.3d 251, 260 (2d Cir.2006). In other words, "a suspect is entitled to *Miranda* warnings only if he or she is interrogated while 'in custody.' " *Parsad v. Greiner*, 337 F.3d 175, 181 (2d Cir.), *cert. denied*, 540 U.S. 1091, 124 S.Ct. 962, 157 L.Ed.2d 798 (2003). The in-custody test is an objective one: "whether a reasonable person in defendant's position would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest." *United States v. Ali*, 68 F.3d 1468, 1472 (2d Cir.1995). As this Circuit has explained:

> it makes sense for a court to begin any custody analysis by asking whether a reasonable person would have thought he was free to leave the police encounter at issue. If the answer is yes, the *Miranda* inquiry is at an end; the challenged interrogation did not require advice of rights. On the other hand, if a reasonable person would not have thought himself free to leave, additional analysis is required because, as *Berkemer v. McCarty*, 468 U.S. at 439–40, 104

S.Ct. 3138, 82 L.Ed.2d 317, instructs, not every seizure constitutes custody for purposes of *Miranda*. *Cf. Posr v. Doherty*, 944 F.2d 91, 98 (2d Cir.1991) ("[I]t is not enough to say a person has been arrested simply because, due to police action, he reasonably believes he is not free to leave."). In such cases, a court must ask whether, in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest. *See California v. Beheler*, 463 U.S. at 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275; *see also Stansbury v. California*, 511 U.S. at 322, 114 S.Ct. 1526, 128 L.Ed.2d 293. Only if the answer to this second question is yes was the person " 'in custody' for practical purposes," and "entitled to the full panoply of protections prescribed by *Miranda.*" *Berkemer v. McCarty*, 468 U.S. at 440, 104 S.Ct. 3138, 82 L.Ed.2d 317. *United States v. Newton*, 369 F.3d 659, 672 (2d Cir.2004). Moreover, absent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial. *Id.,* at 675.

 Additionally, where *Miranda* does apply:

> Invocation of the *Miranda* right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *McNeil v. Wisconsin*, 501 U.S. at 178, 111 S.Ct. at 2209. But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning. *See ibid.* *("[T]he* likelihood that a suspect would wish counsel to be present is not the test for applicability of *Edwards"); Edwards v. Ari-*

*zona, supra,* 451 U.S., at 485, 101 S.Ct., at 1885 (impermissible for authorities "to reinterrogate an accused in custody if he has *clearly asserted* his right to counsel") (emphasis added). Rather, the suspect must unambiguously request counsel. As we have observed, "a statement either is such an assertion of the right to counsel or it is not." *Smith v. Illinois*, 469 U.S., at 97–98, 105 S.Ct., at 494 (brackets and internal quotation marks omitted). Although a suspect need not "speak with the discrimination of an Oxford don," *post*, at 2364 (SOUTER, J., concurring in judgment), he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect. *See Moran v. Burbine*, 475 U.S. 412, 433, n. 4, 106 S.Ct. 1135, 1147, n. 4, 89 L.Ed.2d 410 (1986) ("[T]he interrogation must cease until an attorney is present only [i]f the individual states that he wants an attorney") (citations and internal quotation marks omitted).

*Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362, (1994). However:

> any "[d]oubts must be resolved in favor of protecting the constitutional claim," *Michigan v. Jackson*, 475 U.S. at 633, 106 S.Ct. at 1409, and the courts must " 'indulge every reasonable presumption against waiver of fundamental constitutional rights,' " *id.* (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). The courts must also "give a broad request for counsel." *Michigan v. Jackson*, 475 U.S. at 633, 106 S.Ct. at 1409. *See also Connecticut v. Barrett*, 479 U.S. at 529, 107 S.Ct. at 832 (noting that Barrett

Court was "not denigrat[ing] the 'settled approach to questions of waiver [that] requires us to give a broad, rather than a narrow, interpretation to a defendant's request for counsel' " (quoting *Michigan v. Jackson*, 475 U.S. at 633, 106 S.Ct. at 1409)).

*United States v. Quiroz*, 13 F.3d 505, 511 (2d Cir.1993). Further, it is well settled that once a suspect invokes his right to counsel, he may not be interviewed unless counsel is present. *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *McNeil v. Wisconsin*, 501 U.S. 171, 177, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991).

■ Likewise, invocation of the *Miranda* right to remain silent must be unambiguous. *Campaneria v. Reid*, 891 F.2d 1014, 1021 (2d Cir.1989). That is, if, before or during the interrogation, the suspect states unequivocally that he wishes to remain silent and refuses to answer questions, interrogation must cease. *United States v. Ramirez*, 79 F.3d 298, 304–05 (2d Cir.1996). "[I]nvocation of the right to remain silent must be construed liberally." *Bradley v. Meachum*, 918 F.2d 338, 342 (2d Cir.1990).

It should be noted that the Supreme Court in *Davis*, decided in 1994, indicated:

> Of course, when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney. That was the procedure followed by the NIS agents in this case. Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel. But we decline to adopt a rule requiring officers to ask clarifying ques-

tions. If the suspect's statement is not an unambiguous or unequivocal.

*Davis*, 512 U.S. at 461–62, 114 S.Ct. 2350. Nevertheless, the Second Circuit in *Ramirez*, decided in 1996, and which relied on *Davis* in reaching its holding ("To the extent that the Supreme Court's ruling in *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362, which addressed the question of the need for clarity in a suspect's invocation of the right to counsel, may be applied to a suspect's right to remain silent, it confirms the correctness of the district court's ruling." *Id.*, at 305) stated:

> In some circumstances it may be unclear whether a suspect has invoked his right to remain silent. We have stated that where a suspect has invoked his right equivocally or ambiguously, the officers are permitted to ask narrow questions only for the purpose of clarifying the ambiguity. *Id.*

*Id.*, at 304. Regarding this apparent conflict, the treatise, Federal Criminal Practice: A Second Circuit Handbook commented:

> A suspect must also unequivocally invoke the right to remain silent. *See United States v. Ramirez*, 79 F.3d 298, 304 (2d Cir.1996). However, " '[i]nvocation of the right to remain silent must be construed liberally.' " *Bradley v. Meachum*, 918 F.2d 338, 342 (2d Cir. 1990). **The Second Circuit has held that if it is unclear whether a suspect has invoked the right to silence, "the officers are permitted to ask narrow questions only for the purpose of clarifying the ambiguity," although it is uncertain whether that rule survives the Supreme Court's decision in *Davis v. United States,* which rejected such a limitation on further questioning when the suspect ambiguously in-**

vokes the right to counsel. *Ramirez,* 79 F.3d at 304.

1–7 Federal Criminal Practice: A Second Circuit Handbook, at 7–6 (emphasis added).

In any event, once a suspect has unequivocally invoked the right to remain silent, the police are not forever precluded from resuming questioning. However, the police must give the suspect his *Miranda* warnings again, and they must scrupulously honor his right to remain silent, for example, by renewing the questioning only after the passage of a significant period of time and by limiting the renewed questioning to a different subject matter than the original interrogation. *Campaneria v. Reid,* 891 F.2d at 1021; *Zappulla v. People of New York,* 391 F.3d 462, 489–90 (2d Cir.2004). In *United States v. Montana,* 958 F.2d 516, 518–19 (2d Cir.1992), this Circuit determined that an officer, in making an unsolicited statement to the effect that any cooperation would be brought to the attention of the Assistant United States Attorney, did not scrupulously honor the defendant's right to remain silent. Similarly in *Campaneria,* 891 F.2d at 1021, the Circuit ruled that telling the defendant, "if you want to talk to us, now is the time to do it" was not consistent with scrupulously honoring his previously invoked right or to remain silent.

Finally, it should be noted:

that defendant's refusal to sign a waiver form is not dispositive of the issue. *See United States v. Scarpa,* 897 F.2d 63, 68 (2d Cir.) ("While merely answering questions after *Miranda* warnings have been given does not necessarily constitute a waiver, no express statement of waiver is required."), *cert. denied,* 498 U.S. 816, 111 S.Ct. 57, 112 L.Ed.2d 32 (1990); *United States v. Boston,* 508 F.2d 1171, 1175 (2d Cir.1974) (Fifth Amendment waiver was knowing and voluntary; failure to execute written waiver not dispositive but may indicate no waiver intended), *cert. denied,* 421. *United States v. Spencer,* 955 F.2d 814, 819 (2d Cir.1992).

**1. Defendant's Statements of July 14, 2005**

■ The defendant argues that any statements he made to McArdle and McCaffrey on July 14, 2005, are inadmissible, since they were the result of custodial interrogation made in the absence of his *Miranda* warnings and since they were not voluntarily given. The Court disagrees on both points. First, while no *Miranda* warnings were given, none were required, since the Court concludes by a preponderance of evidence that the defendant was not in custody. In that regard, Court determines that with respect to the conversations involving McCardle, McCaffrey, and the defendant, which occurred at the defendant's home, a reasonable person in the defendant's position would not have understood himself to be subjected to the restraints comparable to those associated with a formal arrest. Only two officers, McArdle and McCaffrey, came to the defendant's residence at 480 North Landing Road. They were both dressed in plain clothes and, while they were armed, their weapons were concealed. After knocking on the door and introducing themselves to the defendant and Field, McCardle indicated that he and McCaffrey were investigating a matter out of the Oklahoma Division that involved computers and child pornography. McArdle then asked the defendant's permission to come inside the residence and speak to him, and the defendant gave his permission. Once inside, McArdle elaborated that there was a website that was hacked into that was found to be a repository for child pornography, and that the reason he and McCaffrey were standing there was because an IP address involved in the investigation came back to 480 North Landing Road. McArdle re-

quested an opportunity for McCaffrey and himself to speak privately with the defendant, who agreed to McArdle's request. McArdle explained to the defendant that he had a choice to help facilitate their investigation by allowing the FBI to take and examine his computers, but he did not have to do so. The defendant decided to give McArdle and McCaffrey the two hard drives from his upstairs computer, but nothing with respect to his downstairs computer. He further signed both a consent to allow the hard drives which he turned over to be examined, as well as a receipt which McArdle gave him for the hard drives. McCardle and McCaffrey never placed the defendant under arrest or even mentioned to the defendant that they were considering arresting him if he decided not to speak to them. Furthermore, McCardle and McCaffrey never threatened the defendant or made him any promises of any kind to induce him to speak with them or ever restrained him in any fashion. Furthermore, after being at 480 North Landing Road for less than an hour, they left.

Additionally, the Court finds by a preponderance of evidence that the defendant's statements were voluntary. As indicated above, McCardle and McCaffrey were at 480 North Landing Road for less than an hour, and during that time neither one ever threatened him in any way or made him any promises to get him to talk. Furthermore, the defendant clearly was not tricked into speaking, since McArdle, at the outset, candidly advised him of the exact nature of their investigation. Moreover, the defendant did not exhibit any signs that he was intoxicated, nor was he subjected to any physical or psychological coercion.

## 2. Defendant's Statements of September 28, 2005

As to any statements he purportedly made on September 28, 2005, the defen-

dant contends that suppression is required, since they were not voluntarily obtained and since they were the result of interrogation occurring while he was in custody and after he invoked both his right to counsel and his right to remain silent. The Government counters that the defendant's statements were in fact voluntary and that, after being advised of his *Miranda* warnings, he never unequivocally invoked either his right to counsel or his right to remain silent. Consequently, the Government maintains that such statements are admissible.

 First, the Court agrees that there is no evidence that the defendant was subjected to any type of coercion by McArdle, Kocher, or any other agent. He was never threatened physically or psychologically abused in any manner, or made any type of promises such that his will was overborne. Regarding specifically the references to cooperation, as this Circuit observed in *United States v. Ruggles*, 70 F.3d 262 (2d Cir.1995):

> Certainly, statements to the effect that it would be to a suspect's benefit to cooperate are not improperly coercive. *See United States v. Pomares*, 499 F.2d 1220, 1222 (2d Cir.), *cert. denied*, 419 U.S. 1032, 95 S.Ct. 514, 42 L.Ed.2d 307 (1974); *United States v. Ferrara*, 377 F.2d 16, 17–18 (2d Cir.), *cert. denied*, 389 U.S. 908, 88 S.Ct. 225, 19 L.Ed.2d 225 (1967). Statements such as these are merely common sense factual observations. *See United States v. Jaswal, supra*, 47 F.3d at 542; *United States v. Shears*, 762 F.2d 397, 402 n. 3 (4th Cir. 1985).

*Id.*, at 265.

Turning now to the *Miranda* issues and whether the defendant unequivocally invoked his right to counsel and/or his right to remain silent, the Court relies on the

analysis in *Quiroz.* There the Circuit stated:

> The record reveals, however, that Dallesandro did not ask Quiroz orally and directly whether he was willing to waive his rights. Rather, Dallesandro asked Quiroz to read the advice-of-rights forms, asked whether he understood the forms, and simply asked Quiroz to sign them. **We have no doubt whatever that, had Quiroz signed, Dallesandro would have viewed that act as a complete waiver of Quiroz's rights.** We can see no good reason not to treat Quiroz's refusal to sign forms in the absence of counsel as a refusal that was coextensive with the waiver Dallesandro sought.
>
> \* \* \* \* \* \*
>
> In sum, we do not view Quiroz's refusal to sign the forms as a limited request for counsel, any more than Dallesandro's request to sign the forms was a request for a limited waiver. Since we do not view Quiroz's statement as narrower than the agent's request, we see no ambiguity. In the absence of ambiguity, further questions by the authorities were prohibited, for there was nothing to clarify. Quiroz's request for counsel should have concluded Dallesandro's questioning. The motion to suppress the statements thereafter obtained from Quiroz should have been granted.

*Quiroz,* 13 F.3d at 512 (emphasis added). Here, on September 28, 2005, at about 11:47 a.m., McArdle read the defendant *Miranda* warnings, as they appear on Exhibit # 3, the Advice of Rights form. After doing so, McArdle sought a waiver from the defendant by reading from the form, "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present," and then saying to the defendant, "If you agree with the statement you can sign the form."

The defendant according to McArdle, unequivocally responded that he would *not* sign the form. As in Quiroz, McArdle did not ask the defendant orally if he would be willing to waive his rights. In other words, this is not a situation where law enforcement officer asks a suspect if he would be willing to waive his rights, gets an affirmative response, but then gets a negative response when he asks the suspect to sign a written form. Rather, here McArdle, in the first instance, affirmatively sought to obtain a waiver from the defendant by instructing him that, if he agreed with the waiver of rights language on Exhibit # 3, to sign the form. The defendant refused. As in *Quiroz,* the defendant's response was not narrower than McArdle's request. Moreover, as in *Quiroz,* the Court has no doubt whatsoever that, had the defendant signed, McArdle and Kocher would have viewed that act as a complete waiver of the defendant's rights. Apparently, McArdle and Kocher believed that the defendant had unequivocally and not ambiguously invoked his right to counsel and/or his right to remain silent, since upon his refusal to sign the waiver form, they ceased their questioning and did not attempt, at that point, to clarify any perceived ambiguity. Consequently, the Court concludes that the defendant's invocation of his right to counsel and his right to remain silent were not ambiguous, but unequivocal. Furthermore, as indicated above, the right of counsel, once unequivocally invoked, can not be waived absent the presence of counsel. Also, under the facts of this case and the applicable principles of law, McArdle and Kocher failed to scrupulously honor the defendant's right to remain silent.

 Even assuming *arguendo,* as the Government maintains, that the defendant invoked his right to counsel and his right to remain silent equivocally or ambiguously, the Court concludes that suppression is

nonetheless required since McArdle and Kocher, at least as to the defendant's right to remain silent, failed to limit themselves to "narrow questions only for the purpose of clarifying the ambiguity," as required by this Circuit. *Ramirez,* 79 F.3d at 304. As indicated above, the Second Circuit in *Ramirez,* decided subsequent to the Supreme Court's decision in *Davis,* reiterated that the law in the Circuit remains, that in circumstances where a suspect's invocation of his right to his remain silent is equivocal, the interrogating officers are limited to only narrow questions solely for the purpose of clarifying the ambiguity. Moreover, comments made to a suspect that burden him in his effort to assert his rights or that attempt to wear down his resistance can not be considered permissible clarification. *United States v. D'Antoni,* 856 F.2d 975, 981 (7th Cir.1988). In this case, by repeatedly telling the defendant that any cooperation would be brought to the attention of the AUSA and by telling the defendant that he was about to be taken to the Marshal's office, so that if he wanted to make any statements this was the time, McArdle and Kocher did not conduct themselves in a manner consistent with the limitation recognized in this Circuit, that they engage solely in a narrow inquiry aimed at clarifying any asserted ambiguity. Further, it is clear that the Government cannot rely on the defendant's subsequent willingness to speak to cure this infirmity. *Campaneria,* 891 F.2d at 1022; *United States v. Dell'Aria,* 811 F.Supp. 837, 846 (E.D.N.Y.1993).

## CONCLUSION

Accordingly, defendant's motion (# 38) to suppress physical evidence is denied, as well as his motion (# 38) to suppress statements made on July 14, 2005. However, his application (# 38) to suppress any statements made on September 28, 2005, is granted.

IT IS SO ORDERED.